**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1696-17

HUNY & BH ASSOCIATES, INC.,
YAEL SILBERBERG 2012
APPOINTED TRUST, HILLEL
WEINGARTEN 2013 TRUST,
URI WEINGARTEN 2013
TRUST, NATAN WEINGARTEN
2013 TRUST, and DANIEL
WEINGARTEN,

      Plaintiffs-Respondents,

v.

AVI SILBERBERG and YAEL
SILBERBERG,

      Defendants-Appellants,

and

YAFFA SILBERBERG, and as
Interested Parties Only, HARBINA
MANAGEMENT COMPANY, LLC
and THOMAS J. HERTEN, ESQ.,
solely as Guardian Ad Litem for
CHANA SILBERBERG, ROCHEL
MALKA SILBERBERG, CHAIM
SHMUEL SILBERBERG, NISSON
SILBERBERG, MORDECHAI

SILBERBERG and YITTA CHAYA
SILBERBERG,

      Defendants-Respondents,

and

YAEL SILBERBERG and AVI
SILBERBERG,

      Third-Party Plaintiffs/
      Appellants,

v.

SIMA WEINGARTEN, EARL
SMITH, DENA WOLF, ESQ.,
MCDERMOTT WILL & EMERY,
KRAMER BURNS, ARNOLD
MYTELKA, ESQ., LOWENSTEIN
SANDLER, JEFFREY WILD,
ESQ., WARREN RACUSIN, ESQ.,
JUDY SPERO, SHERA
TUCHMAN, GAYA BERNSTEIN,
DARLENE FISHER, BEFFIE
YURMAN, and JOSEPH
APPLEMAN,

      Third-Party Defendants/
      Respondents.

_____

      Argued May 18, 2020 – Decided December 27, 2021

      Before Judges Ostrer, Vernoia and Susswein.

      On appeal from the Superior Court of New Jersey, Law
      Division, Bergen County, Docket No. L-10677-15.

2

Avi Silberberg, appellant, argued the cause pro se.

Mark A. Berman argued the cause for appellant Yael Silberberg (Hartmann Doherty Rosa Berman & Bulbulia, LLC, attorneys; Mark A. Berman, Jeremy B. Stein and Janel Alania, on the briefs).

Jeffrey J. Wild argued the cause for respondents HUNY & BH Associates, Inc., Yael Silberberg 2012 Appointed Trust, Hillel Weingarten 2013 Trust, Uri Weingarten 2013 Trust, Natan Weingarten 2013 Trust, Earl Smith and Beth Yurman (Lowenstein Sandler LLP, attorneys; Jeffrey J. Wild and Craig Dashiell, on the brief).

Arnold K. Mytelka argued the cause for respondents Daniel Weingarten and Sima Weingarten (Javerbaum Wurgraft Hicks Kahn Wikstrom & Sinis, attorneys; David L. Menzel, Arnold K. Mytelka and Joseph D. Castor, on the brief).

N. Ari Weisbrot argued the cause for respondents Harbina Management Company, LLC and Joseph Appleman.

Paul R. Marino argued the cause for respondents McDermott Will & Emery LLP and Dena Wolf (Day Pitney LLP, attorneys; Dennis R. LaFiura, Paul R. Marino and Michael L. Fialkoff, on the brief).

David W. Lentz argued the cause for respondents Judy Spero, Shera Tuchman, and Gaya Bernstein (Lentz & Gengaro LLP, attorneys; David W. Lentz, of counsel and on the brief).

Thomas J. Herten, Guardian Ad Litem, argued the cause for respondents Chana Silberberg, Rochel Malka

A-1696-17

Silberberg, Chaim Shmuel Silberberg, Nisson Silberberg, Mordechai Silberberg, Yitta Chaya Silberberg and Eliezer David Silberberg (Archer & Greiner PC, attorneys, join in part in the briefs of respondents HUNY & BH Associates, Inc., Yael Silberberg 2012 Appointed Trust, Hillel Weingarten 2013 Trust, Uri Weingarten 2013 Trust, Natan Weingarten 2013 Trust, Earl Smith and Beth Yurman and respondents Daniel Weingarten and Sima Weingarten).

The opinion of the court was delivered by

OSTRER, J.A.D.

This appeal arises out of a dispute between a wealthy father, Daniel Weingarten ("Daniel"), and his daughter, Yael Silberberg ("Yael") — although other family members, most notably Yael's husband, Avi Silberberg, and various professionals have entered the fray or have been pulled into it. At this point, the dispute mainly involves Yael's claims to the assets of an inter vivos trust Daniel established for her benefit and custodial accounts that Daniel established and funded.[1]

In a comprehensive opinion issued after a lengthy bench trial, the court denied Yael's claims to the trust assets and granted in part and denied in part her claims to custodial account balances. The court found that Daniel created "at

---

[1] For convenience, we utilize the first names of Weingarten and Silberberg family members and intend no disrespect in doing so.

most a revocable [t]rust" that he later revoked and placed its assets into a second trust that limits Yael's rights to its assets. The court also denied her breach-of-fiduciary-duty claims against the trustees of the first trust. In addition, the court held that Avi lacked standing to pursue, in his own right, various claims against Daniel and others for allegedly cheating his wife out of her entitlement to the trust and other assets, and the court sanctioned Avi for frivolous litigation.

On appeal, Yael argues that the court should have deemed the original trust irrevocable and the decanting of its assets into the second trust improper, and that it should have granted her claim to the custodial accounts in its entirety. She also challenges the court's judgment by raising issues involving personal jurisdiction, her right to a jury trial, and fair notice. Avi also appeals, challenging the dismissal of his substantive claims and the sanctions order.

We affirm in part and reverse in part.

I.

Daniel is a wealthy real estate investor. So were his parents and his immigrant grandparents before them. The prior generations passed on their accumulated wealth through trusts and fractional interests in real estate in a manner they believed would ensure their children a measure of financial security but also encourage them to live productive lives. In carrying out that family

5

wealth plan, they formally placed property in their children's names or in trusts for their children, but routinely retained actual control over the assets during their own lifetimes.

Daniel implemented the same family wealth plan, establishing trusts for each of his four children — Yael, and sons Hillel, Uri, and Natan Weingarten. Daniel also made them shareholders in his real-estate holding company, plaintiff HUNY & BH Associates, Inc. (HUNY).

Daniel created the Yael Weingarten Trust ("the YWT") in December 1992, shortly after Yael's thirteenth birthday. Rather than hire an attorney to draft a trust that met his goals, Daniel revised a trust form that the family had been using. Daniel simply "whited-out" the names of the settlor, the beneficiary, and the trustees, and typed in his name as the settlor, Yael's as the beneficiary, and, his sister Judy Spero and cousins Shera Tuchman and Gaya Bernstein as trustees.

Daniel did not read the document, except to make sure it included a provision that he believed permitted him to control the trust assets. That provision empowered the trustees to "employ on behalf of the trust such attorneys, accountants, clerks, agents and other employees as the Trustees may deem necessary or advisable."

6

Among the provisions Daniel did not read was one on the second-to-last page, which expressly stated, "The trust provided for herein shall be irrevocable." Also, the trust required the trustees to hold the corpus along with any income earned from it that they did not distribute (in their discretion) to Yael while she was a minor. Within thirty days after reaching twenty-one, Yael was empowered to withdraw the trust principal. The trustees were required to notify her of that right. Also, when she became twenty-one, the trustees were required to distribute to her directly the trust's net income. Assuming Yael did not withdraw the trust principal during the thirty-day window, the trust would continue until she reached thirty-five, when it would terminate and any corpus and undistributed income would be paid to her.

The trust stated it was "executed and delivered in the State of New York" and that the "trust shall be governed by the laws of said State."[2] The trust empowered the trustees to remove the trust's "situs" to any jurisdiction they, in their discretion, deemed advisable, "and to elect to have the law of the appointed situs govern the administration of the trust."

---

[2] It said so notwithstanding that, according to the notarizations, neither Daniel (a New Jersey resident) nor Spero (an Ohio resident) signed the document in New York.

A-1696-17

The trust's initial corpus was $500 cash. But in the ensuing years, Daniel deeded to the YWT (and similar trusts for Hillel, Uri and Natan) fractional interests in real estate, like those that had been passed down in the family. But, relying on the trust provision that he believed permitted the trustees to delegate their responsibilities to him, he controlled the property, transferring or exchanging it for other property as he saw fit. Sometimes, he comingled his own funds with the trust's. For example, in 2011, he withdrew the YWT's share of the proceeds from the sale of a family real estate property — he claimed it was a loan — and paid it back in 2014.

The trustees admitted they deferred to Daniel's judgment and delegated administrative responsibility to him. They explained they loved him and Yael and trusted him to know and do what was in her best interests. Contrary to the trust's direction, they did not inform Yael of her time-limited right to withdraw principal when she became twenty-one, when the trust held fractional interests in three properties. Daniel did not inform her either. Nor did the trustees ever distribute to her the net trust income, but Daniel separately gave her thousands of dollars monthly and paid for her college education, travel to Israel, and wedding celebration.

  A-1696-17

Daniel explained that he "never realized [the withdrawal right provision] was there," and added that, had he known, he never would have included it out of concern for "protect[ing]" the family wealth plan. He elaborated that the "whole family transferred everything from generation to generation through trusts." He explained that if an individual — as opposed to a trust — held, say, a three-percent interest in real property, then the individual's creditors could file a lien against the property and cause problems for all the other family owners. Even one person causing problems "would have affected the whole family, so that's the way we did things."

Yael testified at trial that, if given notice and the opportunity, she would have exercised her right to withdraw the trust assets, so that she could use the money for tuition (although her father paid for that) or possibly a car. The court found that, even if she received notice, Yael would have waived her right to a distribution (as had other family members granted such rights under similar trusts). At twenty-one, Yael was living at home with her parents while attending Stern College and had no significant expenses of her own. Family members testified she had become an increasingly observant Orthodox Jewish woman who lived modestly and was, without exception, obedient to her parents. They believed it was unlikely she would have withdrawn any of the assets over her

parents' objection. As further indication of her deference to her father at that time, after she became twenty-one she gave her parents several general powers of attorney, including ones authorizing Daniel to sign stock certificates and transfer stock in her name.

After Yael was engaged to marry Avi in March 2004, Daniel asked Avi to sign both religious and secular prenuptial agreements — as others in his extended family had done in the past. Daniel wanted to protect the family's wealth, particularly assets of his own that he had placed in his daughter's name. And he wanted to assure Yael could obtain a religious divorce if the need arose.[3] Avi declined and suggested, regarding the proposed financial prenuptial agreement, that Daniel instead simply take the assets out of Yael's name. Yael wanted to be married notwithstanding the absence of the agreements. She agreed with the plan to take assets out of her name in return for her parents' blessing of the marriage and willingness to overlook the lack of a prenuptial agreement.

Over the years, Daniel became concerned that Avi, whom he and other family members described as controlling, would try to interfere with Yael's trust

---

[3]  See, e.g., Aflalo v. Aflalo, 295 N.J. Super. 527, 534-35 (Ch. Div. 1996) (discussing the husband's power of divorce under Jewish law and tradition).

and other family assets. Yael told Sima that Avi lost all of her earnings and their cash wedding gifts in the stock market. Avi was terminated from his job as an attorney, relied on public assistance to provide for the family, did not earnestly seek employment, and made several requests to Daniel and other family members for large sums of money.

In August 2012, Daniel consulted with Dena Wolf, a trust and estates attorney with the New York office of McDermott Will & Emery (MWE). He told Wolf he wanted to "extend" the YWT. Wolf drafted a new trust, the Yael Silberberg 2012 Appointed Trust ("the YSAT"), by agreement between Daniel as settlor and Tuchman and Bernstein as trustees. On Daniel's advice, the YWT's trustees — Spero, Tuchman, and Bernstein — then executed documents to formally decant or transfer the YWT's assets into the YSAT. The YSAT provided for payment to Yael of the net trust income for life and any other distributions the trustees determined appropriate for her benefit, and designated trusts for her children as residuary beneficiaries. The YSAT included a New York choice-of-law provision and declared New York as its situs (we discuss

that provision in detail below). At Daniel's direction, Wolf created similar trusts for his sons.[4]

With the understanding that the children would soon gather at their parents' New Jersey home, Wolf mailed to Daniel copies of the four trusts along with notice letters for each child to sign. When they met, Daniel explained to Yael that he needed to create the new trust to continue making gifts for the benefit of her and her children. The court found that Yael signed the letter acknowledging receipt of the YSAT. Although she alleged her signature was forged, the court credited Daniel's testimony and a handwriting expert's opinion that Yael's signature was genuine.[5]

After Tuchman and Bernstein resigned as YSAT trustees on November 11, 2013, in the wake of growing friction between Daniel and his daughter and

---

[4] Wolf also prepared a document assigning as of December 2003 Yael's twenty-five-percent ownership in HUNY. Although HUNY did not formally issue shares, Daniel intended that ownership be divided equally among his four children. (Their first initials formed the corporate name.) Consistent with the pre-marital agreement to remove assets from her name, Daniel had transferred Yael's interest to her brother Natan in December 2003, although the transaction was not confirmed in writing at the time.

[5] The court also found — contrary to Yael's additional forgery claim — that Yael signed the acknowledgement of the transfer of her interest in HUNY as of December 2003. Contemporaneous emails, her 2004 tax return, Yael's admissions to a cousin, and the handwriting expert's opinion supported the court's finding.

12

son-in-law, Daniel appointed his longtime accountant, Shane Yurman, in their stead. Daniel signed the appointment document on November 26, 2013. Yurman signed and had notarized an acceptance document dated November 27, 2013, and sent it to Daniel the next day, but Yurman then passed away on December 29, 2013. That same day, Daniel appointed Earl Smith, who promptly accepted the trusteeship.

Meanwhile, believing there was a gap in the trusteeship which triggered her right to appoint trustees (Yael alleged Yurman's signature was also forged), Yael prepared a letter on December 5, 2013, at Avi's request, designating him, his sister Judy Saltzman, and mother Yaffa Silberberg, as the YSAT's trustees. Soon thereafter, Yaffa demanded, on behalf of the putative new trustees, that Daniel immediately distribute the "entire [t]rust [f]und" to Yael. The court rejected Yael's forgery claim, crediting the testimony of Yurman's wife and the notary who confirmed his signature at trial.

Daniel formally removed the new purported trustees, and Smith moved the situs of the YSAT to New Jersey on February 4, 2014, where it remained at the time of trial.

A-1696-17

Also at issue were Yael's rights to funds in two custodial accounts. Daniel opened the first at the former Summit Bank[6] under the title "Yael Weingarten UGMA, Daniel Weingarten Cust[odian]" with an account number ending with 1726 ("1726 Account"). Daniel testified that he commingled Yael's and his own funds in the account. Daniel testified that Yael was aware she had a bank account; she gave him checks she received as gifts (for a birthday, for example) to deposit. But Daniel also deposited substantial distributions from trusts and from real estate properties within and outside the YWT (the largest single deposit exceeded $500,000, the YWT's share of the proceeds of a property Yael's grandmother deeded to the trust at Daniel's direction).

The balance in the account was $25,783 as of Yael's twenty-first birthday in December 2000, though Daniel did not transfer the account or any of the funds to her at that time. He said he was unaware of the obligation to do so. Daniel continued to use the account for his own purposes thereafter. He made roughly $2 million in deposits and withdrawals until the account closed. According to his expert's analysis of the account, he also made four deposits totaling $84,000

---

[6] As a result of multiple transactions, Summit Bank ultimately became part of Bank of America.

A-1696-17

as gifts to Yael — $20,000 the day after her twenty-first birthday, $20,000 roughly a year later, and two $22,000 deposits in 2003.

Yael denied she knew of the account until she received a wage and income transcript from the IRS showing a 1099 for the account, which had apparently been delivered to Daniel in Teaneck in 2013. But her tax returns, which she certified that she had reviewed and were accurate, included income from the account until 2008. Daniel closed the account on August 3, 2012, with a balance of $62,522, which he transferred into the newly-formed YSAT's trust account.

Details in the record of the second custodial account are sparse. Bank statements show that Daniel opened it at some point in or prior to December 1993 at the former United Jersey Bank (a predecessor of Summit Bank) with an account number ending in 1061 ("1061 Account") and an opening balance of $95,013, and closed it in August 1997. Daniel's accounting expert reported that Daniel withdrew nearly the entire opening balance from the account in December 1993 and, over the following three years, deposited another $91,578 and withdrew $91,591. The expert testified he had no information on the purpose of those transactions.

A-1696-17

## II.

In brief, the court held that Yael was not entitled to a distribution of the YWT's assets and the trustees were not liable for a breach of fiduciary duty. The court concluded that Daniel signed the YWT "due to a mistaken belief" as to its effect and did not intend to create an irrevocable trust whereby he would surrender his rights to the assets before he was ready to transfer them to Yael. The court reformed the trust to coincide with his intention. Because Daniel was entitled to revoke the reformed trust, he was entitled to place its assets into the YSAT, and the trustees, for this and other reasons, had not breached any fiduciary duties. The court further found Yael's assignment of her HUNY shares valid. As for the custodial accounts, the court declined to award her any funds from the 1726 Account on the ground the claim was time-barred, but it did award her all deposits Daniel had made into the 1061 Account. We will discuss the court's findings and reasoning in further detail as we discuss the issues on appeal.

## III.

Yael challenges the court's judgment on three dispositive procedural grounds. She contends the court lacked personal jurisdiction to adjudicate most of plaintiffs' claims. She contends the trial court should have granted her a jury

16

trial. And she contends the court unfairly decided the case on grounds the parties did not present and she did not have an opportunity to address. We turn to these issues first.

A.

Yael concedes the court properly asserted personal jurisdiction to decide her interest in HUNY, which plaintiffs addressed in their declaratory judgment complaint's first count. But she contends the court lacked personal jurisdiction to adjudicate plaintiffs' remaining claims. We disagree.

Our standard of review is a hybrid. Because personal jurisdiction involves a "mixed question of law and fact," Citibank, N.A. v. Est. of Simpson, 290 N.J. Super. 519, 532 (App. Div. 1996), we defer to the trial court's findings of jurisdictional facts, Mastondrea v. Occidental Hotels Mgmt. S.A., 391 N.J. Super. 261, 268 (App. Div. 2007), but review de novo the legal question whether those facts support jurisdiction, Patel v. Karnavati Am., LLC, 437 N.J. Super. 415, 423 (App. Div. 2014).

There are two forms of personal jurisdiction: general jurisdiction, which exists when a defendant's "affiliations with the State are so 'continuous and systematic' as to render [the defendant] at home in the forum State," Goodyear Dunlop Tires Ops., S.A. v. Brown, 564 U.S. 915, 919 (2011) (quoting Int'l Shoe

Co. v. Washington, 326 U.S. 310, 317 (1945)); and specific jurisdiction, which lies "when the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum,'" id. at 923-24 (alterations in original) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984)). We limit our review here to specific jurisdiction, because the trial court evidently relied only on that, and plaintiffs' contention that there exists general jurisdiction lacks sufficient merit to warrant discussion.

We must address the merits of Yael's jurisdictional challenge — which is a serious one — because we reject plaintiffs' threshold argument that she waived her jurisdictional objection. Plaintiffs argue that Yael, by conceding the court's personal jurisdiction to decide plaintiffs' first count, effectively waived objection to jurisdiction to decide their other claims. Plaintiffs also argue that Yael waived personal jurisdiction by seeking affirmative relief through counterclaims, crossclaims, and third-party claims, and by omitting a personal jurisdiction defense from her answers.

We are unpersuaded. Deciding specific jurisdiction is "claim specific," meaning that a court may have personal jurisdiction against a defendant as to one claim, but not another. See Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001). Furthermore, where a defendant raises personal jurisdiction in a pre-

18

answer motion, and only thereafter asserts counterclaims — many of which we presume are mandatory, see R. 4:7-1, leaving no real option to withhold them — we discern no basis to infer a waiver. See 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1397 (3d ed. 2004) (stating "a defendant who is contemplating the assertion of a counterclaim always can avoid waiver by raising his defenses through pre-answer motion").

So, we must turn to Yael's substantive arguments on personal jurisdiction — specific jurisdiction in particular. "Specific jurisdiction . . . depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Goodyear, 564 U.S. at 919 (first alteration in original) (quoting Arthur T. von Mehren & Donald T. Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1136 (1966)). For specific jurisdiction to satisfy due process — and our court rules permit personal jurisdiction as expansive as due process permits, Avdel Corp. v. Mecure, 58 N.J. 264, 268 (1971) — a nonresident must have "'certain minimum contacts'" with the forum state "'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322 (1989) (quoting Int'l Shoe, 326 U.S. at 316).

This minimum contacts inquiry focuses on "the relationship among the defendant, the forum, and the litigation." Shaffer v. Heitner, 433 U.S. 186, 204 (1977).

It is critical to our due process analysis "that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws." Waste Mgmt., Inc. v. Admiral Ins. Co., 138 N.J. 106, 120 (1994) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). When a defendant does so, "it is presumptively not unreasonable to require him [or her] to submit to the burdens of litigation in that forum as well." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985). If a plaintiff meets the burden of demonstrating minimum contacts, Blakey v. Cont'l Airlines, Inc., 164 N.J. 38, 71 (2000), the defendant must show that asserting jurisdiction would be unfair or unreasonable, Waste Mgmt., 138 N.J. at 124-25.

Although we have found no New Jersey authority addressing personal jurisdiction in a trust dispute, the Supreme Court recognized long ago "the interest of each state in providing means to close trusts that exist by the grace of its laws and are administered under the supervision of its courts" and "the right

of its courts to determine the interests of all claimants, resident or nonresident."

Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 313 (1950).[7]

Mullane did not apply the minimum contacts test, but Hanson did, 357 U.S. at 251. In Hanson, a Pennsylvania resident originally executed a trust document in Delaware and appointed a Delaware bank as trustee to hold and manage the corpus of securities. Id. at 238. The settlor later moved to Florida where, three years before her death, she exercised a power of appointment, directing trust assets to benefit some family members and not others. Id. at 239-40. The excluded family members challenged the appointment by suing the Delaware-based trustee in Florida. Id. at 240.

The Court held that the Florida court lacked personal jurisdiction over the trustee because it "ha[d] no office[,] . . . transact[ed] no business," and solicited no business in Florida, and "[n]one of the trust assets ha[d] ever been held or administered in Florida." Id. at 251. In sum, the suit was not "one to enforce an obligation that arose from a privilege the defendant exercised in Florida," id. at 252, and the settlor's actions in Florida could not "remedy the absence" of actions by the trustee to "purposefully avail[] itself of the privilege of

---

[7] The Mullane Court ultimately held that service by publication upon known beneficiaries violated the Constitution. 339 U.S. at 320. Notice is not an issue here.

A-1696-17

conducting activities within the forum State, thus invoking the benefits and protections of its laws," id. at 253-54. The Court also held that whether Florida law applied was immaterial: "The issue is personal jurisdiction, not choice of law. It is resolved in this case by considering the acts of the trustee." Id. at 254.

Although Hanson held that personal jurisdiction was lacking, the decision highlights that personal jurisdiction, whether over a trustee as in Hanson or over a beneficiary as in this case, depends on the facts, including the locus of a trust's execution, administration, and assets. In three instructive cases presenting different facts, courts in Illinois and California upheld personal jurisdiction over out-of-state beneficiaries of trusts. See Van Buskirk v. Van Buskirk, 267 Cal. Rptr. 3d 655 (Ct. App. 2020); Kaufman v. Barbiero, 999 N.E.2d 764 (Ill. App. Ct. 2013); Tankersley v. Albright, 374 F. Supp. 530 (N.D. Ill. 1973).

In Van Buskirk, involving a bitter intra-family dispute much like this case, a son asserted personal jurisdiction in California over his mother, who was a settlor, a trustee, and a beneficiary, and over his twin sisters, who were successor trustees and successor beneficiaries. 267 Cal. Rptr. 3d at 658-60. The three lived in Idaho. Id. at 658-59. Years earlier, the mother and her husband (who died soon thereafter) established the revocable living trust in California where they then resided. Id. at 658. Its corpus initially consisted of numerous

A-1696-17

properties in California, where the trust was administered. Id. at 659. Believing their brother, a California resident, was taking advantage of their elderly mother, the two sisters moved their mother from a California rehabilitation center to Idaho where they both lived. Ibid. The mother then registered the trust in Idaho and removed the son as a beneficiary. Ibid. The trust also transferred most of the California assets and acquired Idaho assets, so most of its assets were in Idaho. Ibid. The son's lawsuit challenged various trust transactions and alleged his sisters exercised undue influence over their ailing mother. Ibid.

The court held that the sisters and mother were subject to California jurisdiction because, "[u]nlike the trust in Hanson, the trust here was embedded in California from the beginning." Id. at 663. The court rejected the sisters' argument that jurisdiction did not lie because they lived in Idaho when the allegedly wrongful acts occurred: "No matter where they now live, Respondents' activities have involved a trust that was created and managed in California, that is governed by California law, and that continues to hold interests in California real property. Respondents have purposefully availed themselves of the California forum." Id. at 664. The court noted that the sisters traveled to California to move their mother, and the brother alleged they acted as trustees. Id. at 662.

Kaufman involved a land trust with over 600 beneficiaries. 999 N.E.2d at 766. Five New Yorkers created the trust in New York in 1959 to purchase a large office and commercial building in Philadelphia. Ibid. The trustees originally managed the trust from New York. Ibid. But by 1983, the plaintiff Gerald Kaufman, an Illinois resident and a son of one of the original trustees, had become the sole trustee. Id. at 767-68. He managed the trust from his office in Chicago, where he maintained the trust's accounts, sent distributions, and communicated with beneficiaries. Id. at 768. The defendant, Anthony Barbiero, criticized Kaufman's management in communications with Kaufman and other beneficiaries and asked other beneficiaries to join him to oppose refinancing the property, which Kaufman had proposed. Id. at 768-69.

Kaufman sued Barbiero and two others as class representatives to reform the trust agreement to permit mortgaging or selling the property without the approval of all 600 beneficiaries.[8] Id. at 766. The Illinois appellate court held that "a forum state may assert long-arm jurisdiction over nonresident beneficiaries in order to adjudicate claims related to a trust administered in that forum." Id. at 776. The court relied in part on Barbiero's objections to

---

[8] Over the years, mortgages were executed despite the restriction; but lenders balked after that practice was questioned in a lawsuit (although the lawsuit was later dismissed). Id. at 767-68.

A-1696-17

Kaufman's management: "[I]t should have occurred to [the] defendants . . . that they could reasonably be drawn into litigation in Illinois if they objected to that Illinois administration." Ibid. The court found support for its conclusion in Tankersley, 374 F. Supp. at 531-33, 537. Kaufman, 999 N.E.2d at 774.

Tankersley involved a 1932 trust that held over half the shares of stock in the Tribune Company ("the Tribune"), whose headquarters and principal place of business were in Illinois. 374 F. Supp. at 532. The trust's 145 beneficiaries were scattered across the country. Id. at 536. Two of them, defendants Joseph and Josephine Albright, residents of the District of Columbia and Vermont, objected to proposed changes in the Tribune's corporate structure. Id. at 532-33. A couple of years earlier, Joseph Albright had unsuccessfully campaigned for a trusteeship, which involved traveling to Chicago and meeting and communicating with trustees and beneficiaries. Id. at 532. Responding to the proposed changes, the Albrights wrote to the trustees, alleging they had a conflict of interest. Id. at 532-33. The trustees responded by filing a declaratory judgment action in federal court in Chicago. Id. at 533.

The court upheld personal jurisdiction, finding the required minimum contacts: "[A]ll of the contacts which either of the defendants have had with the Trust, except for the suit filed by them in New York [which they filed after the

A-1696-17

federal suit in Illinois], have been centered in Illinois." Id. at 535. The court also grounded jurisdiction in Illinois' "legitimate interest in affording plaintiffs access to its courts — either state or federal — to settle an existing controversy over the proper administration of the Trust located in Illinois." Id. at 536. The court noted that the trust was created and administered in Illinois, its assets were located there, and the beneficiaries lived all over the country. Id. at 535-36. It added, "If there is a location in the United States where it would be logical to maintain litigation affecting the Trust, its Trustees and its many beneficiaries, Illinois clearly qualifies on every rational basis that can be suggested." Id. at 537 (footnote omitted).

Applying these authorities, we are persuaded that plaintiffs have satisfied the requisites of personal jurisdiction over Yael. The location of a trust's property and management looms large in the cases, and it does so here. Since 2014, New Jersey has been the YSAT's formal situs. Although the YWT initially declared New York as its situs, Daniel, the settlor, has continuously resided in New Jersey. He executed the YWT document here and, as a practical matter, administered both trusts from New Jersey. Many of the properties in which the YSAT and the YWT held an interest were located in New Jersey.

And, while Yael highlights the YWT's initial choice of New York law, "[t]he issue is personal jurisdiction, not choice of law." Hanson, 357 U.S. at 254.

The trust's contacts with New Jersey are exceeded by Yael's own contacts with the state. She grew up here, and for several years after becoming an adult, she remained here, living in her parents' home and receiving their largesse, which plaintiffs contended exceeded the income the trust generated. Although she moved to New York after her marriage in 2004, she continued to communicate with her father and with Harbina Management Company ("Harbina") which managed properties in which the trust held an interest. She signed the acknowledgement of receipt of the decanting documents in New Jersey in September 2012. Thereby, she purposefully availed herself of the privilege of conducting trust-related activities here.

And, importantly, in 2013, Yael challenged the trust's management by purporting to designate her husband, mother-in-law, and sister-in-law as trustees. Then, on behalf of those putative trustees, Yaffa wrote to Daniel, demanding that he immediately transfer to Yael all property that was "in the trust[s] or should have been in the trust[s]." Yael thereby challenged Daniel's own trustee appointments and brought to a head the controversy that plaintiffs' declaratory judgment action sought to resolve. As in Kaufman, "it should have

27

occurred to [her] . . . that [she] could reasonably be drawn into litigation" here based on those actions. 999 N.E.2d at 776.[9]

Furthermore, it does not offend notions of fair play and substantial justice to require Yael to submit to the jurisdiction of the courts of New Jersey. To reach that conclusion, we may consider, among other factors, "the burden on the defendant," "the forum State's interest in adjudicating the dispute," and "the plaintiff's interest in obtaining convenient and effective relief." Burger King, 471 U.S. at 476-77 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)). Although Yael would certainly have found it more convenient to litigate in New York, the burden of crossing the Hudson River (even at rush hour) is not so great as to offend due process. New Jersey, moreover, has a strong interest in hearing a dispute governing the disposition of its residents' property (some of it New Jersey property), and that resident in turn has a strong interest in obtaining convenient and effective relief here.

---

[9] Yael cites Schneider v. Cate, 405 F. Supp. 2d 1254 (D. Colo. 2005), for the proposition that her interest as beneficiary of a New Jersey trust is not enough to support personal jurisdiction. But jurisdiction here rests on more than her interest as a beneficiary. It rests on her numerous purposeful contacts with New Jersey, including her challenge to the trust's management. In Schneider, by contrast, there was "no evidence that [the defendant, a Wyoming resident,] engaged in any affirmative act to reach into" the forum state of Colorado, and the trust's assets were "not strongly linked to Colorado" (they were mostly in Wyoming and California). Id. at 1257-58, 1262.

A-1696-17

In sum, the trial court did not err in denying Yael's motion to dismiss on personal jurisdiction grounds.

## B.

Yael challenges the court's decision denying her demand for a jury trial. She contends she "asserted her right to a jury trial at the earliest moment" possible, which was when the General Equity judge transferred the case to the Law Division (Civil Part) for trial. She also argues that, given the jury trial right's importance, the Law Division abused its discretion when it declined to enlarge the time for demanding a jury under Rule 4:35-1(a). We disagree.

Some background is essential. Plaintiffs filed their amended complaint without a jury demand in the Chancery Division in August 2014. Yael and Avi, pro se, filed four answers with counterclaims, crossclaims, and third-party claims — the first in October 2014 and the third amended answer in December 2014. Although she raised claims for monetary relief that, at least standing alone, might have been triable as of right by a jury, Yael did not demand a jury in any of the four pleadings, nor did she file a jury demand within ten days of filing.

In case management orders in November 2014 and March 2015, the General Equity judge stated that, even if a party had demanded a jury, the party

had to file a formal motion for a jury trial: "[I]f the pleadings contain a jury demand[,] any party seeking a jury trial shall file a motion for a jury trial within (10) days or the jury demand shall be deemed waived." The court prefaced its requirement by stating that "[a] jury demand may require transfer of the matter to the Law Division." The court warned that the jury issue "should be addressed early in the litigation."

Yael did not address the issue until October 2015, a month before the November 15, 2015, date for trial in the General Equity Part. Yael and Avi moved to transfer the case to the Law Division (Civil Part) arguing that the issues in the case were mainly legal in nature and plaintiffs' filing in the Chancery Division ("misfiling," she asserted) subverted their right to a jury trial.

The judge granted the motion, satisfied that the "primary relief sought . . . at this point is legal, not equitable." The judge reasoned that both parties sought adjudication of their legal rights regarding HUNY and the trusts, including the right to appoint trustees; plaintiffs sought money damages for unpaid taxes; Yael and Avi sought money damages for fraud, conspiracy, and conversion; and the declaratory judgment claims were also cognizable in the Law Division. The judge did not expressly find that plaintiffs had misfiled their complaint in Chancery Division in the first place, nor did the judge expressly address Yael's

right to a jury.[10] The court concluded that the Law Division was the more appropriate court to hear a lengthy trial.[11]

---

[10] Notably, declaratory judgment actions may be legal or equitable in nature. See In re Env't Ins. Declaratory Judgment Actions, 149 N.J. 278, 292 (1997) (stating that factual issues in a declaratory judgment action may be tried in the same manner as in other civil actions); Util. Blade & Razor Co. v. Donovan, 33 N.J. Super. 566, 572 (App. Div. 1955) (explaining that declaratory relief is "neither equitable[] nor legal in its nature" but "takes on the color of either, depending upon the issue"). An action to enforce a trust was historically equitable in nature. See Note, The Right to Jury Trial in Enforcement Actions Under Section 502(a)(1)(B) of ERISA, 96 Harv. L. Rev. 737, 748-49 (1983) (stating that "[t]rusts, in turn, were creatures of equity, and their terms were enforced by the Chancellor" (footnote omitted)); see also Restatement (Third) of Trusts § 95 (Am. L. Inst. 2012) (explaining that, "[w]ith limited exceptions, the remedies of trust beneficiaries are equitable in character and enforceable against trustees in a court exercising equity powers"). In addition, restitution is an "equitable doctrine," Wanaque Borough Sewerage Auth. v. Township of West Milford, 144 N.J. 564, 575 (1996), and unjust enrichment claims are likewise equitable, see Giovine v. Giovine, 284 N.J. Super. 3, 30 (App. Div. 1995) (striking jury demand for unjust enrichment claims that were "clearly equitable in nature"), overruled on other grounds by Brennan v. Orban, 145 N.J. 282 (1996); Nat'l Amusements, Inc. v. N.J. Tpk. Auth., 261 N.J. Super. 468, 478 (Law Div. 1992) (stating that claim for restitution for unjust enrichment is an equitable remedy), aff'd, 275 N.J. Super. 134 (App. Div. 1994). So are claims for an accounting, see Eckerd Drugs of N.J., Inc. v. S.R. 215, 170 N.J. Super. 37, 38-39, 42-43 (Ch. Div. 1979) (holding that equitable claim for an accounting was not triable as of right by jury), and for reformation, see Asbestos Fibres, Inc. v. Martin Labs., Inc., 12 N.J. 233, 240 (1953) (recognizing that reformation count raised "a purely equitable issue").

[11] We need not decide the correctness of the transfer order. However, consistent with the intent of merging law and equity, "where an action is brought which in the first instance is cognizable in the Chancery Division, it should be retained in that division irrespective of the fact that before or during the trial the equitable

After the transfer, Yael and Avi filed a formal demand in the Law Division for a jury trial. The Civil Part judge rejected the demand at a case management conference in January 2016 and again the next month upon a formal motion by Yael and Avi. The court found the demand was untimely, and the case management orders should have prompted Yael to act sooner.

We discern no error. Although the right to a civil jury is "one of the oldest and most fundamental of rights," Allstate N.J. Ins. Co. v. Lajara, 222 N.J. 129, 134 (2015); N.J. Const. art. I, ¶ 9, a party may waive that right if she or he does not timely assert it, Carolyn Schnurer, Inc. v. Stein, 29 N.J. 498, 503 (1959)

---

phases of the cause have been fully disposed of, leaving only purely legal issues remaining for determination," Steiner v. Stein, 2 N.J. 367, 378 (1949), but a case that is mistakenly filed in one division may be transferred in the court's discretion, id. at 377; see also R. 4:3-1(b) (authorizing transfer in such instances). On the other hand, "[i]t is not an 'inflexible rule' that chancery, having once acquired jurisdiction, should retain the case 'to settle all the rights of all the parties'"; rather, "[e]ach case requires a measure of the nature and relationship of the issues and claims and the extent to which decision of the legal issues 'is incidental or essential to the determination of some equitable question.'" Lyn-Anna Props., Ltd. v. Harborview Dev. Corp., 145 N.J. 313, 329-30 (1996) (quoting Shaw v. G.B. Beaumont Co., 88 N.J. Eq. 333, 336 (E. & A. 1917)); see also Chiacchio v. Chiacchio, 198 N.J. Super. 1, 5 (App. Div. 1984) (transferring to Law Division third-party claim for insurance coverage that husband-defendant in divorce case filed relating to wife-plaintiff's personal injury claim); May Stores Shopping Ctrs., Inc. v. Hartz Mountain-Free Zone Ctr., 162 N.J. Super. 130, 136 (Ch. Div. 1978).

(stating a party may waive a jury trial by failing to demand it within the time the court rule prescribes).

Rule 4:35-1(a) requires a party to serve a demand for a jury trial "not later than 10 days after the service of the last pleading directed to such issue" triable of right by a jury. "The failure of a party to serve a demand as required . . . constitutes a waiver of trial by jury." R. 4:35-1(c). An amended answer does not expand the window for serving the demand, unless it raises new legal claims triable as of right by a jury, and, even then, the otherwise untimely demand for a jury trial is confined to those new claims. Jon Harvey Pers. of Nassau, Inc. v. Casio, Inc., 149 N.J. Super. 102, 104 (App. Div. 1977); Associated Metals & Mins. Corp. v. Dixon Chem. & Rsch., Inc., 82 N.J. Super. 281, 299 (App. Div. 1963). There is no dispute that Yael's demand was untimely. She served it over a year after her last answer (and Avi conceded before the trial court that the amended answers did not raise new triable issues, so the delay was even longer).

Yael mistakenly claims she filed her jury demand at the earliest possible opportunity — after the case arrived in the Law Division. She could have, and should have, demanded a jury trial while the case was pending in the Chancery Division. The filing of a case in the Chancery Division does not relieve a party of making the timely demand. That is so because a jury trial may be had in

33

Chancery. "Whether the action be brought in the Law Division or the Chancery Division, all issues of fact triable as of right by a jury shall be decided by a jury, unless the right to jury trial be waived, expressly or impliedly." O'Neill v. Vreeland, 6 N.J. 158, 167-68 (1951); see also Boardwalk Props., Inc. v. BPHC Acquisition, Inc., 253 N.J. Super. 515, 526-27 (App. Div. 1991).

To support her argument that the transfer revived her right to demand a jury trial, Yael misreads a statement in Kaplan v. Cavicchia, 107 N.J. Super. 201, 204 (App. Div. 1969). In that case, we affirmed the Chancery Division's denial of a defendant's untimely jury trial demand at a pretrial conference. Id. at 203, 206. The defendant argued that the equitable nature of the plaintiff's case, which sought imposition of a constructive trust on securities, had suddenly become legal in nature — a claim for damages for conversion — after the plaintiff learned that the defendant no longer possessed the securities, and that the change in the nature of the plaintiff's requested relief justified defendant's late request. Id. at 203-04.

We rejected the defendant's excuse for delay on several grounds. We noted that she knew all along she did not possess the securities. Id. at 204. We also rejected her assertion that the action had become purely legal, noting that the trial court exercised its equitable powers pendente lite to require her to

34

deposit securities to secure any judgment against her.  Ibid.  We also observed that she never moved to transfer the case to the Law Division "on the ground that there was an adequate remedy at law."  Ibid.  We then added the comment, which Yael now clutches, that "[u]pon an order for such a transfer . . . she could have at least then demanded trial by jury."  Ibid.

In so commenting, we did not suggest, even in dictum, that the defendant would have been entitled to a jury upon transfer.  Rather, we were discrediting her claim that she genuinely believed the action had become legal in nature and acted promptly once she discovered the legal nature of the plaintiff's claims.  We concluded that, "under the totality of the circumstances, demand for trial by jury was not timely made and defendant's conduct did not justify or excuse her non-compliance."  Id. at 205.  Furthermore, we held that equitable claims remained in the case, which was "properly in the Chancery Division since its inception," and the Chancery Division was empowered to grant legal relief, even if equitable relief became unavailable.  Id. at 205-06.  Judge Conford concurred on the sole ground that there was "no right to a jury trial in the first place."  Id. at 206 (Conford, J., concurring).

A-1696-17

We need not decide whether Yael would have been entitled to a jury trial had she timely demanded one, although we have our doubts.[12] Her demand was late, and the trial court did not abuse its discretion in finding she presented an inadequate excuse for her delay. We acknowledge that a court retains the discretion to enlarge the ten-day deadline for demanding a jury trial, but "the mere statement of 'oversight' or 'inadvertence' does not suffice to invoke the discretion of the court." Carolyn Schnurer, 29 N.J. at 504 (quoting 5 James W. Moore, Federal Practice 718, 719 (1951)); see also ADCO Assocs. v. Admiral Corp., 165 N.J. Super. 437, 440 (App. Div. 1979) (reversing trial court's enlargement of time, stating "[m]ere inadvertence" did not suffice to permit a jury trial demand nine months after the answer and counterclaim's filing); Sweeney v. Veneziano, 70 N.J. Super. 185, 190-91 (App. Div. 1961) (stating

---

[12] See Lyn-Anna Props., 145 N.J. at 331-32 (holding that the Chancery Division correctly tried legal issues raised in a compulsory counterclaim without a jury, because the lawsuit was primarily equitable in nature, and the legal issues were so intertwined with the equitable claims as to be deemed "ancillary"); Boardwalk Props., 253 N.J. Super. at 526-28 (stating that, if the court deemed the action primarily equitable in nature at its inception, there would be no right to a jury trial of "ancillary" legal claims, but there would be such a right for "independent" legal claims). See generally Bruce D. Greenberg & Gary K. Wolinetz, The Right to a Civil Jury Trial in New Jersey, 47 Rutgers L. Rev. 1461, 1472-85 (1995) (discussing doctrine of ancillary jurisdiction and its impact on the right to a jury trial).

that "counsel's admission of failure to make a seasonable demand 'due to his own neglect'" was insufficient grounds to relax the time for demanding a jury).

Even upon a showing of excusable neglect, "the exercise of sound judicial discretion may impel the denial of the motion if, in balancing the equities, the court concludes that the delay [in demanding a jury trial] has been or will be prejudicial to the opposing party." Rockberger v. Stiles, 61 N.J. Super. 60, 64 (App. Div. 1960). By contrast, time has been enlarged where the party's tardiness can be attributed to the other party's "course of conduct." Vonella v. N. Assurance Co., 61 N.J. Super. 348, 354 (Law Div. 1960).

Thus, the decision to deny Yael's late jury trial demand was vested in the trial court's discretion, whether by Rule 1:1-2(a), which authorizes courts to relax the rules, or by Rule 1:3-4(a), which generally authorizes courts to enlarge time frames.[13] We discern no abuse of discretion here. Avi conceded that he simply did not understand that a jury trial demand was required even in the Chancery Division. However, the General Equity judge's case management orders put Yael and Avi on notice that jury demands were permitted in the

---

[13] The court in Rockberger, 61 N.J. Super. at 63-64, and in Sweeney, 70 N.J. Super at 190-91, based the power to relax the ten-day deadline on the former R.R. 1:27B, which is the predecessor of, but not identical to, Rule 1:3-4(a). The court in ADCO, 165 N.J. Super. at 441-42, considered relief under Rule 1:1-2.

Chancery Division. Although the judge invited motions for a jury trial even <u>if</u> one had already been requested, the court's order should have alerted Yael that jury demands were not barred and signaled that the jury issue should be addressed promptly. Yet, rather than immediately ask the court to enlarge the time for demanding a jury trial in November 2014 after the first case management order, or even in March 2015, after the second one, Yael did not act until December 2015, after transfer. This lack of attention and delay, even for pro se parties, did not compel relief from the rule.

In sum, we affirm the trial court's denial of Yael's jury demand.

## C.

We also reject Yael's argument that the court denied her a fair chance to litigate the case because the court decided the matter on an issue not raised before trial: the YWT's revocability.

Although a court ordinarily leaves it to the parties to raise the issues before it, a court may "introduce new issues when the interests of justice require" and doing so "will not prejudice the parties." <u>State, Off. of Emp. Rels. v. Commc'ns Workers of Am.</u>, 154 N.J. 98, 108 (1998). "Prejudice" in this context refers not to the issue's substantive impact, but to the aggrieved party's ability to address it because of inadequate notice. <u>See</u> <u>State v. Heisler</u>, 422 N.J. Super. 399, 415

(App. Div. 2011) (distinguishing between substantive prejudice and procedural prejudice in context of late expert disclosures). To avoid prejudice, "the better practice is to permit the parties to address" the new issue. Off. of Emp. Rels., 154 N.J. at 108.

We recognize that plaintiffs' complaint did not ask the court to reform the YWT to make it revocable. But they did ask the court to reform the trust, consistent with Daniel's intent, to eliminate Yael's right to withdraw trust assets at age twenty-one. We also recognize that plaintiffs did not formally ask the court to invalidate the trust until their post-trial submission. But the trial court openly contemplated invalidating the trust during trial and heard argument on the issue after the close of evidence.

Defense counsel objected to plaintiffs' post-trial argument, contending it would be unfair for the court to belatedly consider invalidation after the court previously denied on timeliness grounds defendants' own motion to conform their pleadings to the evidence. Nonetheless, defendants addressed the validity issue on the merits. And the court, ultimately, reformed the YWT, rather than invalidate it.

39

On appeal, Yael contends the court denied her a fair chance to explore Daniel's intent regarding the trust's revocability, and to argue in favor of the trust's irrevocability. She contends this denial rises to a due process violation.

We are unconvinced. Yael was not totally surprised, she did not object on the grounds she advances on appeal, and we discern no great prejudice. Yael acknowledges plaintiffs raised reforming the trust as to the age provision as an affirmative defense, and the court itself questioned the trust's validity outright during trial. Also, Yael did not object to the court considering the trust's validity on the ground she lacked an adequate opportunity to explore the issue in discovery and at trial; rather, she objected that considering the trust's validity would be inconsistent with the court's handling of her motion to conform the pleadings to the evidence (a decision she does not challenge on appeal), and she argued substantively that the evidence clearly showed Daniel intended to create an irrevocable trust.

Most importantly, Daniel's intent in creating the trust was a major issue throughout the litigation and a subject of extensive examination at trial. The court alerted the parties to the invalidity issue, they had the opportunity to explore it during trial, and they addressed it in pre-decision argument. This case is unlike those where the trial court first raised an issue only after summations,

and the parties had no chance whatsoever to address it. See R. Wilson Plumbing & Heating, Inc. v. Wademan, 246 N.J. Super. 615, 617 (App. Div. 1991) (disapproving of court's injection of issue raised for first time in its final decision); Rivera v. Gerner, 89 N.J. 526, 537-39 (1982) (finding surprise and prejudice when the court first raised qualified immunity defense after summations); Off. of Emp. Rels., 154 N.J. at 108-09 (disapproving of Appellate Division addressing issue — dispute's arbitrability — that parties did not raise before trial court or on appeal).

Furthermore, the YWT's validity was an essential element of Yael's counterclaims based on the YWT's terms. Therefore, the court did not deny Yael due process in addressing it. See Triffin v. Johnston, 359 N.J. Super. 543, 550 (App. Div. 2003) (rejecting due process argument where plaintiff had burden to prove assignments' validity and court addressed issue in its decision, stating "the judge was not required, as fact-finder, to inquire of plaintiff about all the aspects of the assignments that might be the basis for the judge's ultimate finding").

"Fundamentally, due process requires an opportunity to be heard at a meaningful time and in a meaningful manner." Doe v. Poritz, 142 N.J. 1, 106 (1995). It includes the right to present one's own evidence and cross-examine

an adversary's witnesses. McGory v. SLS Landscaping, 463 N.J. Super. 437, 453 (App. Div. 2020). Yael was afforded that right.

Furthermore, this case — despite its transfer to the Law Division — involved equitable claims, as we have discussed. "'Equity looks to the substance, rather than the form.' Under this familiar equitable maxim, the real intention of the parties is the dominant test for evaluating the legal effect of a particular instrument." Brodzinsky v. Pulek, 75 N.J. Super. 40, 47 (App. Div. 1962). Therefore, it should have come as no surprise that the trial court, as a court of equity, would look to the trust's substance, rather than its form, and seek out Daniel's real intention.

We are convinced that after a trial spanning more than thirty days, Yael had a fair opportunity to explore the issue of Daniel's intent and the YWT's revocability, and due process does not require a remand so she can present additional evidence and argument on the subject.

IV.

With those procedural issues addressed, we turn first to Yael's argument that the trial court erred in reforming the YWT to make it revocable. Before addressing the substance of that argument, we address Yael's argument that New York law governs the reformation question.

42

## A.

The trial court addressed but did not decide which law governs the trust dispute, concluding that "whether governed by New York law or New Jersey law, Daniel . . . did not create an irrevocable trust in 1992." We conclude New York governs the reformation decision, as well as issues pertaining to the trust's administration (but, as we discuss below, New York law is not as favorable to Yael as she contends).

Under the common law, identifying the law governing a trust would turn on identifying the underlying issue. Thus, "[t]he local law of one state may be applied to an issue of validity and the local law of another state applied to an issue of administration or to an issue of construction." Restatement (Second) of Conflict of Laws ch. 10, topic 1, intro note (Am. L. Inst. 1971). Under New Jersey common law, the law of the state of the settlor's domicile when he or she executed the trust instrument generally determined the trust's situs and validity. Swetland v. Swetland, 105 N.J. Eq. 608, 613 (Ch. 1930), aff'd o.b., 107 N.J. Eq. 504 (E. & A. 1931).

However, New Jersey statutes now govern choice-of-law issues, and they enforce a settlor's choice of law governing a trust's terms, but not the trust's validity. We apply those statutes, consistent with the principle that "[w]e apply

43

New Jersey's choice-of-law rules in determining whether this State's or another state's law governs the action." In re Accutane Litig., 235 N.J. 229, 254 (2018). Furthermore, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement (Second) of Conflict of Laws §6(1). See also Robert A. Leflar, American Conflicts Law § 101 (3d ed. 1977) ("If there is an express choice-of-law statute in the forum state, the courts there will presumably follow it.").

New Jersey's version of the Uniform Trust Code expressly enforces a settlor's choice of law governing a trust's terms:

> The meaning and effect of the terms of a trust are determined by:
>
> a. the law of the jurisdiction designated in the terms unless the designation of that jurisdiction's law is contrary to a strong public policy of the jurisdiction having the most significant relationship to the matter at issue; or
>
> b. in the absence of a controlling designation in the terms of the trust, the law of the jurisdiction having the most significant relationship to the matter at issue.
>
> [N.J.S.A. 3B:31-7.][14]

---

[14] New Jersey's statute became effective 180 days after its enactment on January 19, 2016, L. 2015, c. 276, § 4, and applies to trusts created before its effective date, N.J.S.A. 3B:31-84(a)(1), and to proceedings commenced before its effective date so long as doing so does not prejudice parties or substantially

This section "provides rules for determining the law that will govern the meaning and effect of particular trust terms." Unif. Tr. Code § 107 cmt. (Unif. L. Comm'n 2000) (discussing Section 107, which is identical to N.J.S.A. 3B:31-7).

By contrast, "[t]he law to apply to determine whether a trust has been validly created is determined under Section 403" of the Uniform Trust Code. Ibid. N.J.S.A. 3B:31-20, which embodies Section 403, states:

> A written trust not created by will is validly created if its creation complies with the law of the jurisdiction in which:
>
> a. the trust instrument was executed;
>
> b. at the time the trust was created, the settlor was domiciled, had a place of abode, or was a national;
>
> c. at the time the trust was created, a trustee was domiciled or had a place of business; or
>
> d. at the time the trust was created, any trust property was located.

---

interfere with the proceedings, N.J.S.A. 3B:31-84(a)(3). Yael does not oppose applying the 2016 law; rather, she invokes it. In any event, prior law generally provided that "[t]he meaning and legal effect of a disposition in a . . . trust . . . shall be determined by the local law of a particular state selected in the . . . trust." N.J.S.A. 3B:3-33.

45

We interpret N.J.S.A. 3B:31-20 to preclude enforcement of a trust provision that purports to supersede these factors and to choose the law governing a trust's validity. Cf. Turner v. Aldens, Inc., 179 N.J. Super. 596, 601 (App. Div. 1981) (citing Restatement (Second) of Conflict of Laws § 6(1) and holding that a statutory choice-of-law provision overrides a contractual one). If the Legislature intended to enforce such provisions, it would have said so, as it did in N.J.S.A. 3B:31-7 regarding provisions governing the meaning and effect of a trust's terms.[15]

---

[15] Perhaps the Uniform Trust Code's drafters chose not to enforce a trust's provision purporting to choose the law governing the trust's validity to avoid bootstrapping. If the trust is not validly created, then neither is its choice-of-law provision that attempts to dictate the law governing validity. See, e.g., Glencore Ltd. v. Degussa Eng'd Carbons L.P., 848 F. Supp. 2d 410, 424-25 (S.D.N.Y. 2012) (refusing to apply choice-of-law provision in contract whose validity was in question, stating it would amount to bootstrapping). By contrast, New York's trust statute enforces an out-of-state settlor's choice of New York law governing a trust's validity as well as its meaning, so long as the trust holds New York real property or the trustee is in New York:

> Whenever a person, not domiciled in this state, creates a trust which provides that it shall be governed by the laws of this state, such provision shall be given effect in determining the validity, effect and interpretation of the disposition in such trust of:
>
> (1) Any trust property situated in this state at the time the trust is created.

Rather, consistent with the common law rule that, in case of a conflict of law, chooses the law upholding a trust's validity, "Section 403 . . . validat[es] a trust if its creation complies with the law of any of a variety of states in which the settlor or trustee had significant contacts." Unif. Tr. Code § 403 cmt.

The statute is not as clear on the effectiveness of a provision purporting to choose the law governing a trust's administration. N.J.S.A. 3B:31-8, which embodies Section 108 of the Uniform Trust Code, authorizes a trust to designate the place of a trust's administration, but, unlike the two provisions discussed above, it does not expressly address how to determine the governing law. N.J.S.A. 3B:31-8(a) states:

> Without precluding other means for establishing a sufficient connection with the designated jurisdiction, terms of a trust designating the principal place of administration are valid and controlling if:
>
> (1) a trustee maintains a place of business located in or a trustee is a resident of the designated jurisdiction; or
>
> (2) all or part of the administration occurs in the designated jurisdiction.

---

> (2) Personal property, wherever situated, if the trustee of the trust is a person residing, incorporated or authorized to do business in this state or a national bank having an office in this state.
>
> [N.Y. Est. Powers & Trusts Law § 7-1.10(a).]

47

The comment to the corresponding Uniform Trust Code section states, "Designating the principal place of administration should be distinguished from designating the law to determine the meaning and effect of the trust's terms, as authorized by Section 107." Unif. Tr. Code § 108 cmt. However, "[u]sually, the law of the trust's principal place of administration will govern administrative matters." Id. § 107 cmt. Therefore, a "transfer of the principal place of administration will normally change the governing law with respect to administrative matters." Id. § 108 cmt.

Here, the YWT expressly states that it was "executed and delivered in the State of New York and said trust shall be governed by the laws of said State." We interpret that broad statement to express the intention to apply New York law to issues involving the trust's validity, as well as the meaning and effect of the trust's terms and its administration. Consistent with this intention, the trust expressly referred to New York's trust statute, providing that the "Trustees shall have and may exercise any and all other powers and discretions given to trustees of inter[ ]vivos trusts by the Estates, Powers and Trusts Law of the State of New York."

The YWT also empowered the trustees to change the chosen law, but only as applied to trust administration. Trustees could "remove the situs of the trust

. . . , in the Trustees['] sole and absolute discretion, to any jurisdiction that the Trustees may deem advisable without prior court approval, and to elect to have the law of the appointed situs govern the administration of the trust." The YWT trustees never exercised this authority to change the trust's situs and choice of law governing trust administration.

The YSAT and its trustee Smith (along with the other "Lowenstein Parties")[16] contend that New Jersey law governs the issue of the YWT's reformation, by dint of its trustee's election in 2014.[17] We are not convinced. With greater specificity than the YWT, the YSAT provides that "all questions pertaining to the validity, construction and administration of this Trust Agreement and the Trusts shall be determined in accordance with the laws of

---

[16] The trial court used "Lowenstein Parties" to refer to the several parties that the Lowenstein Sandler firm represented, which included the YSAT, similar trusts for Yael's siblings, Smith, Yurman and HUNY.

[17] By contrast, on appeal, the YWT's trustees invoke New York law on the "standards of trusteeship" in contending they did not breach their fiduciary duty to Yael. Without expressly addressing the choice-of-law issue, Daniel relies only on New Jersey law in contending the trial court correctly reformed the YWT after finding it was not effectively created; but, in a footnote, Daniel relies on the Lowenstein Parties' brief regarding New York law on reformation.

the State of New York."[18] That choice of law was subject to the trustees' power to change it. Unlike the YWT, the YSAT authorized the trustees to change the choice of law governing not only the "administration of any Trust," but also "the construction of the terms of any Trust and the validity of any Trust to such extent as the Trustees may deem necessary and appropriate."[19]

In exercising this power to change the governing law, YSAT trustee Smith purported to elect on February 4, 2014, that New Jersey law would retroactively govern the YWT. He did so by declaring that New Jersey law would "hereafter govern any matters relating to [the YSAT] Trust (including any assets previously held in any other trust [— that is, the YWT —] that are now held in the Trust or any related trust), its construction and/or validity" (emphasis added).

This election was ineffective as to the YWT. The YSAT expressly authorized its trustees to choose the law governing the trusts it created, not the prior trust whose assets were decanted into the YSAT. The Lowenstein Parties

---

[18] "Trusts" is defined as "all separate trusts held or to be held under this Trust Agreement." The Trust Agreement authorized trusts for Yael's children.

[19] The YSAT also limited this elective power. For example, it expressly barred the trustees from electing a choice of law that would "have the effect of altering any beneficial interest under this Trust Agreement."

A-1696-17

present no case law to support the YSAT trustee's election and we have found none.

In sum, under New Jersey's choice-of-law rules, which are embodied in our state's version of the Uniform Trust Code, our courts will enforce a choice-of-law provision regarding the meaning and effect of a trust's terms but adhere to statutory standards governing the trust's validity. Regarding the terms' meaning and effect — including the issue whether to reform the trust — the trial court was obliged to apply New York law. As for questions regarding administration, New York law applies to actions the trustees took when the situs of the trust was New York. Finally, regarding validity, if the trust's creation complied with New York law, then the court was obliged to apply New York law, because New York was where the "trust instrument was executed,"[20] a "trustee was domiciled or had a place of business," and "trust property was located." N.J.S.A. 3B:31-20(a), (c) to (d). Similarly, if the trust's creation complied with New Jersey law but not New York law, then the court was obliged to apply New Jersey law, because "the settlor was domiciled" there, and "trust property was located" there. N.J.S.A. 3B:31-20(b), (d).

---

[20] As noted, Daniel and Spero were not in New York when they signed the trust instrument.

A-1696-17

B.

Yael's challenge to the court's order reforming the YWT is two-fold. First, she contends New York law bars reformation. Second, she contends that even if reformation were theoretically permissible — applying New Jersey law — there was insufficient evidence in the record to support the trial court's predicate factual findings supporting reformation. We address and reject these arguments in turn.

1.

Yael contends that New York law does not permit reformation of the YWT. She contends that absent obvious ambiguity or mistake on the face of a trust instrument, New York courts will generally refuse to reform a trust. She asserts New York courts will deviate from this general rule only to enable a trust to maximize tax benefits or, in the case of supplemental needs trusts, to maximize governmental benefits for a trust's disabled beneficiary.

We are unpersuaded. In examining New York law, we find no evidence of such limitations on a court's equitable power to reform a trust where evidence clearly shows that the settlor was mistaken about the trust's revocability.

New York courts long ago recognized the principle that a court may reform or rescind a trust that its unambiguous terms make irrevocable, upon a

52

clear showing that the settlor misunderstood the trust instrument. As the Court of Appeals stated, "If it appears that the power to revoke should have been expressed in the instrument, a court of equity will now regard as done whatever the parties really intended, and which in good conscience should have been done, and thus the relief will be adapted to the exigencies of the case." Barnard v. Gantz, 35 N.E. 430, 432 (N.Y. 1893); see also Ludlam v. Ludlam, 185 N.Y.S. 343, 344-45 (App. Div. 1920) (recognizing the power to revoke a trust "upon clear proof" that the settlor "did not comprehend that the paper she was executing was not revocable"), aff'd sub nom. Ludlam v. Conn. Tr. & Safe Deposit Co., 134 N.E. 594 (N.Y. 1922); Vogel v. City Bank Farmers' Tr. Co., 272 N.Y.S. 643, 645 (Sup. Ct. 1934) (reforming deed of trust to insert a revocation clause the donor intended, noting court of equity's power "to relieve this plaintiff from an inadvertent mistake"); Conkling v. Davies, 14 Abb. N. Cas. 499, 501 (N.Y. Sup. Ct. 1878) (stating the plaintiff was "entitled to be relieved" from the effect of an irrevocable trust deed the "plaintiff did not intend to make"); cf. Delap v. Leonard, 178 N.Y.S. 102, 103 (App. Div. 1919) (entering decree of reformation of unilateral gift of a deed, stating "[w]hen there is no mistake about plaintiff's intention, but only in the writing, the mistake of the scrivener, no matter how it occurred, ought to be corrected"); Schrieber v.

Goldsmith, 79 N.Y.S. 846, 848 (Sup. Ct. 1902) (stating, with regard to deed, "a mistake of the donor in giving more than she intended at the time to give is sufficient to justify a decree for reformation").

Modern cases have continued to apply that principle. See Kreindler v. Irving Tr. Co., 272 N.Y.S.2d 202, 204 (App. Div. 1966) (stating an irrevocable trust may be cancelled "upon proof of the settlor's misunderstanding of the nature of the instrument"); Guest v. Bessemer Tr. Co., 142 N.Y.S.2d 188, 189 (App. Div. 1955) (explaining that a "voluntary irrevocable deed of trust may not be vacated by the trustor on the ground that . . . he [or she] believed that it was revocable, 'except upon clear proof of the trustor's misunderstanding of the nature of the paper executed'" (quoting Ludlam, 185 N.Y.S. at 345)); see also Harrison v. Grobe, 790 F. Supp. 443, 453 (S.D.N.Y. 1992) (applying Kreindler and Barnard), aff'd, 984 F.2d 594 (2d Cir. 1993). It is of no moment that the proponents of reformation in Kreindler, Guest, and Harrison failed to secure relief. Though the proponents of reformation in those cases fell short on the facts, the courts reaffirmed their power to reform trusts to remedy a mistake about irrevocability.

Consistent with but not limiting this principle, New York courts have exercised their power to reform trusts so they qualify as supplemental needs

trusts that assure maximum governmental benefits. See, e.g., In re Rappaport, 866 N.Y.S.2d 483, 488 (Sur. Ct. 2008) (reforming testamentary trust to convert it into a qualifying supplemental needs trust). The courts have done so even where the scrivener made no mistake, because the scrivener drafted the instrument before New York authorized supplemental needs trusts. See In re Will of Kamp, 790 N.Y.S.2d 852, 853, 856-58 (Sur. Ct. 2005) (rejecting contrary reasoning in In re Rubin, 781 N.Y.S.2d 421, 424 (Sur. Ct. 2004)); see also In re Keybank Nat'l Ass'n, 67 N.Y.S.3d 407, 422 (Sur. Ct. 2017) (reforming supplemental needs trust to conform with federal law in order to achieve the objective of maximizing governmental benefits).

We do not disagree with Yael's contention that under New York law, courts rarely resort to extrinsic evidence to interpret a trust or a will absent ambiguity or mistake on the face of the instrument. See, e.g., Snide v. Johnson ex rel. Snide (In re Snide), 418 N.E.2d 656, 657-58 (N.Y. 1981) (articulating this principle, but reforming will where husband mistakenly signed his wife's will and wife signed her husband's); In re Will of Goldstein, 363 N.Y.S.2d 147, 150 (App. Div. 1975) (reforming will that mistakenly described devised property that the testator did not own). In that respect, New York law differs from New Jersey's. See In re Trust of Nelson, 454 N.J. Super. 151, 163 (App.

A-1696-17

Div. 2018) (rejecting rule that doctrine of probable intent does not apply when the document is clear on its face, concluding "a court may resort to extrinsic evidence to unveil ambiguity that does not appear on the document's face").

But Yael overlooks the distinction between interpretation and reformation.  As we explained in Nelson, "reformation involves remaking or modifying an instrument, to correct mistakes, to fulfill an unexpressed intention, or to address circumstances that were unforeseen."  Id. at 160.  Interpretation involves discerning "the meaning 'of language already in the instrument.'"  Id. at 159 (quoting Unif. Tr. Code § 415 cmt.).  The distinction between interpretation and reformation is evident in the two lines of New York cases we have discussed.  Thus, New York law's restrictive approach to interpretation does not constrain a New York court's equitable power to reform a trust that the settlor clearly did not intend to make irrevocable.

In sum, the trial court's reformation order did not violate New York law.

2.

In the alternative, Yael argues that, even if reformation is permitted to correct a mistaken understanding about a trust's revocability — which Yael assumes (mistakenly) is permissible only under New Jersey law — the trial court's finding lacks the support of sufficient credible evidence in the record.

The court found that the YWT "was at most a revocable [t]rust" based on "Daniel's complete ongoing control of the trust, as well as his belief that he was not giving up ownership or control, even if that constituted a mistaken belief about the legal effect of language in the trust document." The court stated:

> Although Daniel Weingarten executed a document he created from one that apparently had originally been drafted as a form of irrevocable trust, he . . . repeatedly stated by his words and actions that he did not consider it irrevocable. As he and the other members of his generation said on many occasions, putting property in the name of a trust for the benefit of a younger generation family member was not the same as making a present gift, as the donors intended to maintain complete control, including the right to revoke the transfer.

The court credited "Daniel's testimony that he was unaware of various provisions in the 1992 Trust, including the provisions requiring that Yael be notified of a right of withdrawal at her twenty-first birthday and providing for outright distribution at the age of thirty-five." The court was convinced Daniel intended, consistent with the "family tradition," to "pass family wealth down to the succeeding generations in a gradual manner, maintaining complete control and ownership until they intentionally relinquished them." The court concluded that Daniel proved, "by clear and convincing evidence, that he did not intend (i) to create an irrevocable trust whereby he would give up the right to assets, (ii)

to grant Yael (or his other children) a genuine right to withdraw trust assets at age twenty-one, or (iii) to create a right for any of them to receive trust assets outright at age thirty-five." The court found he proved, again by "clear and convincing evidence" that he executed the documents that purportedly created those rights "due to a mistaken belief . . . as to the effect of the documents."

Yael marshals record evidence to dispute the court's finding. She argues that Daniel acted inconsistently with an intent to create a revocable trust. Daniel filed federal gift tax returns when he transferred property above threshold amounts to the YWT and filed income tax returns for the trust — both of which Yael contends would have been unnecessary if the trust were revocable. He also "borrowed" and repaid money from the trust, which she says made no sense if the trust were revocable. And he decanted the YWT's assets into the YSAT. Wolf testified that she believed the YWT was irrevocable and that a decanting consistent with New York law was necessary to transfer its assets.

Citing Tuchman's testimony, Yael also argues that the older generations were very much aware that, under the form of trust family members used, the beneficiaries were entitled to exercise an option to receive a trust's corpus at age twenty-one. Indeed, the court found that Daniel "likely . . . was asked to sign at age twenty-one a waiver" of his own right to receive assets from the trust created

for his benefit. Although the giving generation did not expect the children to exercise that right, that expectation arose not from a mistaken understanding of the document, but from an expectation the children would respect tradition and obey their elders' wishes.

Yael also cites excerpts of Daniel's testimony in which he referred to his intention to make gifts for his children, distinguished between his own assets and those designated for his children, and explained that he was motivated to create the YSAT to avoid distributing the YWT's assets to Yael when she became thirty-five. She also contends that the court's finding of a mistake is inconsistent with Daniel's claim in the litigation (later jettisoned) that Yael was responsible for the income taxes the trust paid after she reached twenty-one, because once she waived her right to receive a distribution, she was properly deemed the grantor of the trust.

However persuasive this evidence might be were we deciding this case anew, we must hew to a "limited and well-established scope of review"; we may disturb the trial court's "'factual findings and legal conclusions'" only if "'we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)

A-1696-17

(quoting In re Tr. Created by Agreement Dated Dec. 20, 1961, 194 N.J. 276, 284 (2008)). "[T]he appellate court therefore ponders whether, on the contrary, there is substantial evidence in support of the trial judge's findings and conclusions." Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974). If the answer is positive, the appellate court "should not disturb the result, even though it has the feeling it might have reached a different conclusion were it the trial tribunal." State v. Johnson, 42 N.J. 146, 162 (1964). The appellate court must defer even if "the case may be a close one or . . . the trial court decided all evidence or inference conflicts in favor of one side." Ibid. Deference is especially appropriate where "evidence is largely testimonial and involves questions of credibility." Seidman, 205 N.J. at 169 (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

Applying this deferential standard of review, we shall not disturb the trial court's finding, which placed great weight on Daniel's actions. And parties' actions under a contract — or, in this case, a settlor's action under a trust instrument — "is often the strongest evidence of their meaning." Restatement (Second) of Contracts § 202 cmt. g (Am. L. Inst. 1981). Although Daniel may have viewed the trust assets as "gifts" and felt obliged to return assets he "borrowed," Daniel did not relinquish control over them until he was ready and

60

willing to do so. The gift tax return and trust income tax returns may have reflected his accountant's understanding of the legal status of the trust, rather than Daniel's intentions. Notwithstanding the evidence to the contrary, the court's finding regarding Daniel's intent rested on sufficient credible evidence and reasonable inferences based thereon. Most significantly, the court focused on the evidence of the family tradition of the gradual transfer of wealth to members of the younger generation while promoting their self-sufficiency, Daniel's almost total disregard of the actual text of the trust instrument he signed, and his total control of the assets that he assigned to the trust.

Yael's factual argument minimizes the trial court's preliminary findings about Daniel's extensive control over the YWT's assets. As to those findings, there is no room for reasonable dispute. The trustees never possessed or controlled any trust assets. There was no trust bank account. Daniel transferred property in and out of the trust at will.

The court correctly noted that under New York and New Jersey law, retaining such control could render an irrevocable trust illusory. See Coffey v. Coffey, 286 N.J. Super. 42, 52-53 (App. Div. 1995); Burns v. Turnbull, 41 N.Y.S.2d 448, 449 (App. Div. 1943), aff'd, 62 N.E.2d 785 (N.Y. 1945). The failure to relinquish control may undermine the writing purporting to create the

A-1696-17

trust.  In re Est. of Gagliardi, 440 N.Y.S.2d 775, 777 (App. Div. 1981); In re Cercia, 108 N.Y.S.2d 753, 753-54 (App. Div. 1951).  Yet, consistently with the strong public policy to validate trusts, see Unif. Tr. Code § 403 cmt., and to further Daniel's beneficent purpose, the court reformed the trust to make it revocable, rather than invalidate the trust entirely.  The trial court did not abuse its discretion in its "balancing of the equities and its formulation of an appropriate remedy."  See Sears Mortg. Corp. v. Rose, 134 N.J. 326, 354 (1993).

## V.

We turn next to Yael's argument that the YWT's trustees improperly decanted the YWT's assets into the YSAT.  Yael contends that the trustees lacked authority under New York law and the YWT's terms to transfer the YWT's assets into the YSAT.  This is an issue of trust administration.  For the reasons we have already discussed, because New York was YWT's situs, New York law governing trust administration applies.

However, we need not explore the intricacies of New York law governing decanting assets from one trust to another.  The so-called decanting statute, N.Y. Est. Powers & Trusts Law § 10-6.6, upon which Yael relies, applies only to irrevocable trusts.  It restricts the power of trustees of an "invaded trust" — which is defined as an irrevocable trust — to transfer part or all of the trust's

assets to an "appointed trust" — which is defined as another irrevocable trust. N.Y. Est. Powers & Trusts Law § 10-6.6(b) to (c) (setting conditions for such transfers); § 10-6.6(s)(1), (6) (defining "appointed trust" and "invaded trust" as irrevocable trusts). But the YWT as reformed was a revocable trust. The decanting statute therefore did not affect Daniel's right to transfer its assets into the irrevocable YSAT. Inasmuch as Yael presents no alternative basis to limit Daniel's right to have done so, we reject Yael's challenge to the decanting and affirm the trial court's order upholding the validity of the YSAT.

VI.

Yael also contends the trial court should have found that the YWT's trustees breached their fiduciary duties by (1) failing to give her notice of her right to withdraw trust assets upon becoming twenty-one and (2) failing to distribute to her, after she became twenty-one, all the trust's net income as it was earned.

The trial court held that "Daniel's complete and continuous exercise of control over the [YWT] negated and rendered illusory any role for the trustees." The court also found that Yael suffered no harm from the alleged breach of fiduciary duty. The failure to notify her that she could receive trust assets upon becoming twenty-one caused no damage because she would have acceded to her

63

father's request — consistent with those of other family elders — to waive that right.  Also, based on the report of an accounting expert, Daniel "did in fact expend sums for her or on her behalf over the years that exceeded the trust income she would have been entitled to" if the trust's income provision had been implemented as written.  The trustees also argue that under the trust as reformed, there was no right to withdraw assets upon Yael reaching age twenty-one or a right to receive net income thereafter; consequently, there could be no breach of fiduciary duty by failing to implement those provisions.  The trustees also invoke the YWT's exculpation clause.

Daniel's control (and the revocability of the trust as reformed) limited the trustees' role, but it did not "negate it."  Whether or not a trust is revocable, a "trustee has a duty to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law."  Restatement (Third) of Trusts § 76 (Am. L. Inst. 2007); 19 George Gleason Bogert et al., The Law of Trusts and Trustees § 1061 (3d ed. 2017) (stating, regarding revocable trusts, "[i]f held by a trustee . . . exercise of a power is subject to fiduciary duties").  But "the duties of a trustee of a revocable trust are owed exclusively to the settlor" because the settlor's power to revoke is equivalent to owning "the assets subject to the power."  17 Bogert et al., § 964 (3d ed. 2008).  And trustees of a

revocable trust are obliged to comply with a settlor's written directions, "even though the direction is contrary to the terms of the trust or the trustee's normal fiduciary duties." Restatement (Third) of Trusts § 74. Consistent with these principles, a revocable trust's trustee "cannot be held liable for conduct knowingly approved by a competent settlor," although the trustee remains "clearly subject to normal fiduciary duties to the settlor." 17 Bogert et al., § 964.[21]

Given the trustees' duties were owed exclusively to Daniel as settlor of the revocable trust as reformed, the trial court correctly held that the trustees did not breach a fiduciary duty to Yael. Furthermore, even assuming for argument's sake the trustees were answerable to Yael, she bore the burden to show that their alleged breach caused a loss. See In re Est. of Donner, 626 N.E.2d 922, 927 (N.Y. 1993) (stating that to obtain a surcharge for trustee's mismanagement "the objectors must show that the trust's losses resulted from the trustee's negligence or failure to exercise such prudence" (quoting In re Hahn, 462 N.Y.S.2d 924,

---

[21] The trustees here did not merely retain Daniel as a manager or an investment advisor as the trustees seem to argue, citing In re HSBC Bank U.S.A., 947 N.Y.S.2d 292, 302 (App. Div. 2012). In that case, the court denied a claim that a trustee of a revocable trust breached his fiduciary duty by following investment advice from the settlor's son, who "was a knowledgeable and savvy investor." Ibid. Here, by contrast, the trustees ceded complete control to Daniel.

927 (App. Div. 1983), aff'd, 466 N.E.2d 144 (N.Y. 1984))). The court found that Yael suffered no damage from the trustees' failure to notify her that she could withdraw assets upon becoming twenty-one (because she would have waived that right) and their failure to distribute income thereafter (because Daniel provided her with income exceeding the trust's net income). The court's finding is supported by sufficient credible evidence in the record. Therefore, we defer to it.[22]

---

[22] Absent the court's order reforming the trust into a revocable one, which made the trustees answerable to Daniel, it is unclear that the trustees could find refuge in the YWT's exculpation clause. The provision relieved the trustees of any liability for losses resulting from an "act or omission . . . in good faith," "any honest mistake or misjudgment," or "anything other than their own gross negligence or malfeasance." Arguably, the trustees failed to exercise any duties under the trust, rather than exercise them negligently or mistakenly in good faith. See In re Cowles' Will, 255 N.Y.S.2d 160, 174 (App. Div. 1965) (holding that exculpatory clause relieved trustee of liability absent showing of "willful negligence, self-dealing or bad faith"), aff'd, 215 N.E.2d 509 (N.Y. 1966); Hazzard v. Chase Nat'l Bank of N.Y., 287 N.Y.S. 541, 554-55 (Sup. Ct. 1936) (stating that "gross negligence" may include an intentional failure to perform a duty), aff'd, 14 N.Y.S.2d 147 (App. Div. 1939), aff'd, 26 N.E.2d 801 (N.Y. 1940). Notably, under a 2018 amendment, it is against public policy in New York, even in the case of an inter vivos trust, to exonerate a trustee "from liability for failure to exercise reasonable care, diligence and prudence." L. 2018, c. 245, §1 (codified at N.Y. Est. Powers & Trusts Law § 11-1.7). Before the amendment, some courts questioned whether the limitation on exculpation clauses applied to inter vivos trusts. See HSBC Bank, 947 N.Y.S.2d at 302 (holding the law did not apply and disapproving Surrogate Court opinions to the contrary); Bauer v. Bauernschmidt, 589 N.Y.S.2d 583, 583 (App. Div. 1992) (stating "exculpatory provisions like those in the present case" — which

In sum, we affirm the trial court's order denying Yael's claim against the YWT's trustees for breach of fiduciary duty.

VII.

Yael claims that all Daniel's deposits into the 1726 Account belong to her, including those made after she reached twenty-one, when the UTMA required Daniel to transfer the custodial property to her, see N.J.S.A. 46:38A-52. Yael relies on the provision stating that transfers into a UTMA are "irrevocable" and the subject property "indefeasibly vested in the minor," N.J.S.A. 46:38A-24, as well as the common law presumption reaffirmed in Bhagat v. Bhagat, 217 N.J. 22, 41-42 (2014), that a parent who transfers money to a child intends it as a gift. She contends the trial court erred in ruling that her claim to the 1726 Account was time-barred. She alleges she did not discover that the 1726 Account existed until she obtained tax documents in 2013.

The court bifurcated Yael's claims into (1) a claim for the $25,783 balance in the account when she reached twenty-one and (2) a claim for deposits made thereafter. Regarding the former, the court found, "Yael was aware of [the 1726 Account] before and on her twenty-first birthday." The court noted that Yael

exculpated trustee for actions or omissions in good faith — "are valid in inter vivos trusts so long as there is some accountability, at least, to the settlor").

"would occasionally give [Daniel] money to deposit into the account for her." Therefore, "any claim to demand distribution of the balance as of that date is long-barred by the statute of limitations." Notably, Daniel did not dispute that Yael would have been entitled to the $25,783 but for the time bar.

Regarding post-twenty-first-birthday deposits, the court deemed them made to a joint account and concluded Daniel rebutted the gift presumption: "His testimony, coupled with the pattern of the use of the account, satisfy the court to the clear and convincing standard that he did not intend those deposits to be gifts to Yael."

We reverse the court's holding that the statute of limitations barred Yael's claim to the custodial property as of her twenty-first birthday. "Whether a cause of action is barred by a statute of limitations is a question of law, [which is] reviewed de novo." Catena v. Raytheon Co., 447 N.J. Super. 43, 52 (App. Div. 2016). Although neither the trial court nor plaintiffs identified which limitations period applies, we conclude that a statute of limitations governs Yael's claim,[23]

_____

[23] Our courts have declined to apply the statute of limitations to express trusts, where the dispute is between the beneficiary and the trustee, the dispute is "of a kind" within equity's exclusive jurisdiction, and a "direct trust" is involved. See Williams v. McKay, 40 N.J. Eq. 189, 196-97 (E. & A. 1885); Fid. Union Tr. Co. v. Anthony, 13 N.J. Super. 596, 607 (Ch. Div. 1951), aff'd, 18 N.J. Super. 49 (App. Div. 1952); Livingston v. Rein, 133 N.J. Eq. 585, 591 (Ch. 1943). A

and the applicable period is six years because Yael's claim is in the nature of one "for taking, detaining, or converting personal property." N.J.S.A. 2A:14-1. We do so for the following reasons.

Yael had a claim to the custodial property when she reached twenty-one. The UTMA in New Jersey states that a "custodian shall, in an appropriate manner, transfer the custodial property to the minor . . . upon . . . [t]he minor's attainment of 21 years of age with respect to custodial property transferred under [N.J.S.A. 46:38A-8 or -9]" absent express direction that the transfer occur sooner after the minor reaches eighteen. N.J.S.A. 46:38A-52. Transfer of the custodial property is mandatory. See Bennett v. Chi. Title & Tr. Co., 936 N.E.2d 1068, 1075-1077 (Ill. App. Ct. 2010). When a custodian fails to transfer the property, imposition of a constructive trust in favor of the former minor is appropriate. Peter v. Gibson, 336 S.W.3d 2, 5-6 (Ky. 2010) (imposing

_____

UTMA account is an alternative to a formal trust, avoiding a trust's complexity and expense, but in many respects it is similar to one, enabling a donor to make an irrevocable gift to a minor held in trust under a custodian's control. See Roberts v. Roberts, 388 N.J. Super. 442, 451-52 (Ch. Div. 2006) (comparing a formal trust with a custodial account). But a trust beneficiary may maintain an action at law "for money had and received" "where there has been a final settlement of the accounts of the trustee of an active trust, . . . the sum due the cestuis que trust has been definitely determined, and the trustee is under a peremptory duty to render payment of the amount so found to be due." Capraro v. Propati, 127 N.J. Eq. 419, 427 (E. & A. 1940).

constructive trust on custodial property that the custodian failed to relinquish when son reached age of majority).

Although imposition of a constructive trust is an equitable remedy, Stewart v. Harris Structural Steel Co., 198 N.J. Super. 255, 266 (App. Div. 1984), "the statute of limitations runs against the right to assert a constructive trust," Markley v. Camden Safe Deposit & Tr. Co., 74 N.J. Eq. 279, 282 (Ch. 1908), and the court must apply the statute of limitations applicable to the most analogous legal claim absent an "overriding reason why that . . . would be inequitable," Fox v. Millman, 210 N.J. 401, 422 (2012).  We conclude that the six-year limitations period "for taking, detaining, or converting personal property" is appropriate.  N.J.S.A. 2A:14-1.

But we also conclude — as the trial court implicitly did — that the discovery rule applies.  Application of the discovery rule is an issue for the court. Catena, 447 N.J. Super. at 52.  Under the rule, the time to sue does not start "until a plaintiff is able to discover, through the exercise of reasonable diligence, the facts that form the basis for an actionable claim against an identifiable defendant."  Palisades at Ft. Lee Condo. Ass'n v. 100 Old Palisade, LLC, 230 N.J. 427, 435 (2017).  To avoid the time bar, Yael must have discovered her

70

claim after October 2008, because she first raised her claim to UTMA deposits in October 2014, in her first answer and counterclaim.

The discovery rule applies here because Yael's claim is a "tort- or fraud-type action[]" and not a claim under a contract whose terms she would be presumed to know.  See County of Morris v. Fauver, 153 N.J. 80, 110 (1998) (explaining why discovery rule "generally does not apply to contract actions" as distinct from "tort- or fraud-type actions").  Without using the term "discovery rule," the court in Markley tolled the statute of limitations governing a claim to assert a constructive trust because the plaintiff was ignorant of the facts forming an actionable claim.  74 N.J. Eq. at 282-83.

The issue is:  When did Yael discover or when should she have discovered, with the exercise of reasonable diligence, the facts forming an actionable claim?  The trial record supports the finding that Yael, when she became twenty-one, knew there was a bank account that received the checks she gave her father for deposit, but not that there was an account established under the UTMA, let alone that she was entitled under the UTMA to a transfer of all the custodial property when she reached twenty-one.

Plaintiffs argue that the court's finding that Yael knew about the 1726 Account "was well supported by the record, which included Yael's tax returns

71

through 2008 which identified the UGMA account." In support, plaintiffs cite not the returns, but the court's opinion discussing them. But the opinion identified no explicit reference to the UTMA account in the tax return evidence it reviewed. Nor have we found any reference in the tax returns in the record on appeal.

Plaintiffs also point to Yael's and Avi's first answer and counterclaim — which is not included in the record on appeal — in which they alleged that Yael's assets other than her HUNY shares, "such as Bank Accounts, UTMA, [and] UGMA . . . accounts, . . . were listed in Yael Silberberg's tax return through the year 2008 and were illegally transferred only in later years."[24] However, plaintiffs' counsel at trial confronted Avi — not Yael — with this pleading. And neither that pleading nor the subsequent one stated that the tax return separately identified the UTMA account. Furthermore, even if Yael's tax return included a line attributing interest income to the 1726 Account, that is hardly persuasive evidence that she read it or understood it. Her tax returns were prepared by others.

---

[24] In the third amended answer and counterclaim, which is included in the record, Yael and Avi alleged that "[m]ost of [Yael's] other assets, such as Bank Accounts, UTMA, [and] UGMA . . . accounts, . . . were listed in [her] K1 after 2005, and were illegally transferred only in later years."

"In applying the discovery rule, we will not require a level of circumspection that is unreasonable under the circumstances." Catena, 447 N.J. Super. at 56. Daniel purposely withheld information about the 1726 Account from Yael, in keeping with his general practice not to share details with his children about the accounts in their names, and he encouraged Yael to rely on his management of her finances. All the 1726 Account statements and form 1099s went to him, not Yael, and he maintained the checkbook.

There is no evidence that Yael knew that her twenty-first birthday triggered a right to the custodial property. And she was not the only one in the dark. When Daniel was asked why he did not distribute the custodial property to Yael when she reached twenty-one, he said, "Because I didn't know about it, I didn't know that regulation, rule." We will not impute knowledge to Yael that even her father, who controlled the account, lacked.

We also part company with the court's finding that none of the post-twenty-first-birthday deposits were intended as gifts. We agree that the UTMA — particularly N.J.S.A. 46:38A-24, which declares deposits to be irrevocable gifts indefeasibly vested in the child — does not apply to deposits made after the child ceases being a minor. Cf. Peter, 336 S.W.3d at 5-6 (holding that the law of constructive trusts, not the UTMA, governs rights and remedies to

custodial property that custodian failed to transfer upon minor reaching age of majority).[25]

Nonetheless, Daniel had to overcome the common law presumption that the deposits were intended as gifts, because they were transfers from a parent to an account established, at least on its face, for the child's benefit. Bhagat, 217 N.J. at 41. Daniel also had to overcome the opinion of his own expert that $84,000 in deposits were gifts. Confronted with the four deposits that totaled $84,000, Daniel noted that the deposits exceeded the gift exclusion, but he otherwise could not recall them. In sum, the evidence fell short of establishing clearly and convincingly that those four deposits were not intended as gifts.

On appeal, Daniel does not directly challenge the status of the $84,000 as a gift, contending instead that Yael's claim to those deposits is barred by the

---

[25] For that reason, we need not decide whether N.J.S.A. 46:38A-24 creates an irrebuttable presumption of a gift to a minor, as the Pennsylvania Supreme Court has held under its state's version of the UTMA, see Sternlicht v. Sternlicht, 876 A.2d 904, 909-12 (Pa. 2005), or whether a depositor can rebut the presumption under the UGMA or UTMA with clear and convincing proof of mistake, fraud, or contrary intent, as a majority of courts have held, see Jacobs v. Jacobs (In re Marriage of Jacobs), 180 Cal. Rptr. 234, 241-42 (Ct. App. 1982); In re Marriage of Hendricks, 681 N.E.2d 777, 782-83 (Ind. Ct. App. 1997); Golden v. Golden, 434 So. 2d 978, 978 (Fla. Dist. Ct. App. 1983); Gulmen v. Gulmen, 913 S.W.2d 852, 855 (Mo. Ct. App. 1995); Heath by Heath v. Heath, 493 N.E.2d 97, 100-01 (Ill. App. Ct. 1986); State v. Keith, 610 N.E.2d 1017, 1019 (Ohio Ct. App. 1991); Gordon by Gordon v. Gordon, 419 N.Y.S.2d 684, 688-89 (App. Div. 1979).

statute of limitations. But, as Daniel acknowledges, the court did not reach the statute-of-limitations issue regarding a claim to those deposits. And we discern no basis to time-bar Yael's claim, as there is no evidence that Yael was aware that her father made those deposits to her custodial account after she reached twenty-one, when the account should have been closed. As for the balance of the post-twenty-first-birthday deposits, we defer to the trial court's finding that Daniel's deposits were not intended as gifts.

In sum, we reverse that part of the trial court's order denying Yael a recovery of the balance in the 1726 Account when she was twenty-one and $84,000 of the deposits Daniel made thereafter. We affirm the court's order regarding the other deposits.

VIII.

We turn next to Avi's appeal. Avi appeals from orders dismissing various substantive claims, denying reconsideration, denying discovery, and imposing sanctions.

Over a year-and-a-half before trial, the court dismissed all claims Avi asserted in his and Yael's third and final responsive pleading. The court did so because Avi lacked standing. Avi asserted claims, among others, of fraud, conversion, breach of fiduciary duty, and conspiracy against Daniel, Wolf and

A-1696-17

her law firm, and Harbina and Daniel's elderly uncle Joseph Appleman (who managed real estate for the family). The court held that Avi's claims pertained to shares in HUNY and trust assets, and Avi had not pleaded an interest in either. The court rejected as lacking legal authority Avi's claim that his "spousal rights" granted him standing.

After several months passed, Avi asked the court to reconsider its standing ruling. Avi presented the court with a January 25, 2016, written "[t]ransmutation [a]greement" in which, he now argues, he and Yael "expressly said to each other that all our separate property and property rights are shared equally." He contends the written agreement memorialized what "had been in effect since their marriage in 2004."

The court denied the reconsideration motion, concluding that the court's order was not palpably incorrect or irrational and Avi could have presented evidence of the transmutation agreement when he originally opposed the dismissal motion.

Avi appeals from the reconsideration denial. He contends the court mistakenly applied the standard for reconsidering final orders, instead of the standard for reconsidering interlocutory orders; the court should have addressed the transmutation agreement; and the court should have found that the agreement

granted him standing. Avi also separately argues the court erred in dismissing his conspiracy claims against Wolf and her firm for their role in decanting the YWT's assets into the YSAT, and his conspiracy and conversion claims against Harbina and Appleman related to their role in disbursing funds Avi claimed belonged to the YWT and YSAT.

We affirm these orders because Avi lacks standing to assert his substantive claims. "Entitlement to sue requires a sufficient stake and real adverseness with respect to the subject matter of the litigation." N.J. State Chamber of Com. v. N.J. Election L. Enf't Comm'n, 82 N.J. 57, 67 (1980). To obtain standing, a party must show that he or she would likely suffer harm from an unfavorable decision. Ibid.

Avi has no stake in either the YWT or the YSAT, whose assets and income he claims were wrongly diverted. Yael has that stake. Avi also was never a shareholder in HUNY. Yael claims that status. And Avi would suffer no harm from an unfavorable decision, except indirectly. The direct loss is Yael's.

In essence, Avi asserts claims that belong to his wife. However, "a litigant typically does not have standing to assert the rights of third parties." Abbott v. Burke, 206 N.J. 332, 371 (2011). Such standing may be appropriate in exceptional cases "if the litigant can show sufficient personal stake and

adverseness."  Jersey Shore Med. Ctr.-Fitkin Hosp. v. Est. of Baum, 84 N.J. 137, 144 (1980).  But, in Jersey Shore, where a hospital sought recovery from a deceased patient's wife for his unpaid medical bills, no one else but the hospital, as a practical matter, could have asserted his equal protection claim against an antiquated common law rule permitting such recovery against a husband, but not a wife.  Id. at 140-41, 144.  Here, in contrast, Yael was capable of asserting her own claims and did so.  Furthermore, Avi lacks a sufficient personal stake in the trust assets and HUNY stock and the alleged wrongs related to them.

The "transmutation agreement" does not alter our analysis.  There are four reasons.  First, the agreement is not before us.  We are not "obliged to attempt review of an issue when the relevant portions of the record are not included." Cmty. Hosp. Grp., Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C., 381 N.J. Super. 119, 127 (App. Div. 2005).

Second, transmutation is an equitable doctrine meant to avoid injustice in dividing property between divorcing spouses.  See Coney v. Coney, 207 N.J. Super. 63, 75 (Ch. Div. 1985) (explaining that under the transmutation doctrine, "property that once was classified as separate or non-marital can be transmuted into marital property when the spouse with title represents to the other spouse that the property will be shared").  Our courts have not considered the doctrine

as a basis to empower one spouse to assert the other spouse's property rights against a third party.

Third, even in <u>Coney</u>, the court's discussion of the doctrine in connection with equitable distribution was unnecessary to its holding. The court determined the property at issue — the marital home — was subject to equitable distribution under N.J.S.A. 2A:34-23(h). <u>Coney</u>, 207 N.J. Super. at 74. The court did so because the property was acquired in contemplation of marriage. <u>Ibid.</u>; <u>see also</u> <u>Winer v. Winer</u>, 241 N.J. Super. 510, 526-27 (App. Div. 1990) (stating that property purchased in anticipation of marriage for use as a marital home may be considered marital property subject to equitable distribution).

Finally, even as between the parties, the enforceability of the alleged agreement — made orally in 2004 and written in 2016 — is far from clear. As Avi described it, the "transmutation agreement" would qualify as a "premarital agreement" because it affected the parties' rights to each other's property, N.J.S.A. 37:2-34, but we cannot tell if the parties entered the agreement before they married or afterwards. Avi contends vaguely the agreement "existed since [his] marriage in 2004." Although premarital agreements generally are "enforceable if they are fair and just," <u>Steele v. Steele</u>, 467 N.J. Super. 414, 436 (App. Div.), <u>certif. denied</u>, 248 N.J. 235 (2021), and the burden rests with the

opponent to set them aside, N.J.S.A. 37:2-38, they must be in writing, see N.J.S.A. 37:2-33, and this one was not (until 2016).  And premarital agreements will not be enforced if they are unconscionable because of lack of disclosure of assets or lack of independent legal counsel.  See N.J.S.A. 37:2-38(c).  Here, there evidently was little disclosure and no independent counsel.  If Yael and Avi entered the agreement after they married, its enforceability is even more questionable.  See Steele, 467 N.J. Super. at 436 (stating "mid-marriage agreements are generally unenforceable").

Although the trial court mistakenly referred to the standard governing reconsideration of a final judgment, the court's discretion to reconsider an interlocutory order nonetheless "is not subject to wanton invocation or unfettered judicial response."  Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 263 (App. Div. 1987).  Rather, "[i]t is only for good cause shown and in the service of the ultimate goal of substantial justice that the court's discretion should be exercised."  Id. at 263-64.  Given the questionable impact of the transmutation agreement, the court did not abuse its discretion in denying Avi's motion, which he based on the agreement.  See Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (stating that an appellate court shall review a trial court's denial of reconsideration motion for an abuse of discretion).

We also reject Avi's appeal from two discovery orders: the first, quashing a subpoena of an attorney for two Weingarten family trusts, and the second, denying a motion to compel Sima to answer certain deposition questions. Avi sought such discovery to prove that Yael and her children were beneficiaries of additional family trusts and were entitled to a declaratory judgment confirming their status and an accounting. But because Avi undisputedly has no interest in the trusts, he has no standing to challenge these decisions on appeal. See N.J. Chamber of Com., 82 N.J. at 67.

Avi's lack of standing also dooms his arguments challenging the court's decision regarding the decanting of the YWT's assets into the YSAT, the trustees' alleged breach of fiduciary duty, Yael's claim to HUNY stock, and Yael's claims to the 1726 Account. In any event, Yael presented her own arguments on these issues (except the HUNY stock), which we have already addressed.

Finally, we affirm the trial court's imposition of sanctions on Avi. The sanctions were prompted by Avi's motion to intervene under the name of a just-established sole proprietorship Avi owned so he could assert tort claims Yael had purportedly assigned to it. As the court recounted, the motion followed Avi's multiple attempts to litigate claims belonging to Yael despite his lack of

standing, to be admitted pro hac vice, to intervene, and to secure a jury trial despite Yael's failure to demand one in time, as well as multiple motions for reconsideration. Eventually, the court issued a case management order barring the filing of any further pretrial motions to amend pleadings. Avi nonetheless submitted another motion to intervene the following month, along with another proposed pleading. When it was rejected for filing because it contained an amended pleading in violation of the case management order, Avi filed yet another motion to intervene, this time under the name of his recently established sole proprietorship. That motion prompted plaintiffs' cross-motion for sanctions pursuant to Rule 1:4-8. Plaintiffs undisputedly never sent Avi a so-called "safe harbor letter" as the rule requires, see R. 1:4-8(b)(1), explaining that his motion was frivolous and demanding that he withdraw it. See Trocki Plastic Surgery Ctr. v. Bartkowski, 344 N.J. Super. 399, 406 (App. Div. 2001) (stating that a sanctions motion should have been rejected because of movant's failure to provide safe harbor letter).

The court nonetheless imposed sanctions. In a written opinion amplifying its reasoning, the court excused plaintiffs' failure to send the safe harbor letter. We need not explore the court's reasoning on that point, because the court also imposed sanctions on an alternative ground: its authority under Rule 1:10-3 to

enforce its own order precluding further motion practice. The court exercises broad discretion to enforce its own orders and to punish noncompliance. Gonzalez v. Safe & Sound Sec. Corp., 368 N.J. Super. 203, 209 (App. Div. 2004), rev'd on other grounds, 185 N.J. 100 (2005). We discern no abuse of discretion here.

To the extent not addressed, Avi's remaining arguments require no further discussion because they lack sufficient merit, R. 2:11-3(e)(1)(E), and he challenges findings of fact that were adequately supported by the evidence, R. 2:11-3(e)(1)(A).

Affirmed in part and reversed in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION